UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RICHARD MILLS,

                Petitioner,

     -vs-

 SUPERINTENDENT T. POOLE,

                Respondent.
_____

**REPORT AND RECOMMENDATION**
**No. 06-CV-0842(RJA)(VEB)**

## I. Introduction

Richard Mills ("Mills" or "petitioner") has filed a *pro se* petition for a writ of habeas corpus challenging his conviction on December 16, 2004, following a jury trial in New York State County Court, Genesee County, on charges of attempted first degree murder (New York Penal Law ("P.L.") §§ 110.00, 125.27(1)(a)(i)); attempted first degree assault (P.L. §§ 110.00, 120.10(1)); first degree reckless endangerment (P.L. § 120.25); third degree criminal possession of a weapon (two counts) (P.L. §265.02(1)); and third degree criminal possession of a weapon (P.L. § 221.20). Mills was sentenced to concurrent sentences, the longest of which was twenty years to life. He is presently incarcerated pursuant to this judgment of conviction.

Mills' habeas proceeding has been referred to the undersigned pursuant 28 U.S.C. § 636(b) for, *inter alia*, the issuance of a report and recommendation regarding the disposition of his petition. For the reasons that follow, I recommend that the petition be dismissed.

## II. Factual Background and Procedural History

### A. Pre-Trial Proceedings

The conviction here at issue stems from an incident that occurred on December 21, 2001, following repossession by Griffiths Oil Company of the propane tank regulator at Mills' father's house due to non-payment of the bill. The police responded to the house after a representative from the oil company and Mills' father called 911 to report that Mills had threatened the oil company employee, stated that he was going to kill himself, and vowed to shoot any police officer who came to the house. Mills allowed one deputy, who happened to be a family friend, to come in and talk with him. When another a deputy and a sheriff's investigator arrived on the scene, the situation deteriorated: Mills announced that he was "gonna shoot 'em in the head", picked up the loaded rifle on his lap and pointed it through an open window at one of the officers. The deputy inside the house with Mills grabbed the gun barrel and a struggle ensued. Mills was able to seize a shotgun from the table with his free hand, forcing the deputy to grab that gun as well. During the melée, the deputy was in the unenviable position of having the barrels of both guns up against his chest. Hearing that deputy's calls for back-up, the investigator and the other deputy rushed into the house and struggled to get the guns away from Mills. During the fracas, the rifle discharged into the ceiling, barely missing striking the first deputy's face and the second deputy's head. The officers were finally able to subdue Mills and bring him into custody. When the police brought petitioner back to his house to retrieve his psychiatric medication, they found marijuana–over one pound total–stashed throughout the house.

Mills subsequently was charged on March 4, 2002, with attempted first degree murder, first degree reckless endangerment, fourth degree criminal possession of a weapon, and second degree criminal possession of marijuana. Through his attorney, Mills waived his right to an indictment and pled guilty to the lesser included charge of attempted second degree murder and

second degree criminal possession of marijuana. He was sentenced on April 5, 2002, to an aggregate term of ten years in prison. Respondent's Exhibits ("Resp't Exs.")[1] S at 38; T at 98, 119; & U at 4. On October 7, 2003, Genesee County Court Judge Robert Noonan granted Mills' *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 because Mills' waiver of the indictment was invalid. *See* Resp't Exs. T at 98 & U at 4).[2] New counsel was assigned to represent Mills, and the case was returned to pre-waiver status. *See* Resp't Exs. T at 120 & U at 4-5.

On October 23, 2003, Mills was re-indicted on two counts of attempted first degree murder–one count for pointing the rifle at the investigator and the other count for firing the rifle and narrowly avoiding killing the two deputies. He was also charged with two counts each of attempted first degree assault, first degree reckless endangerment (for the investigator and the two deputies), and third degree criminal possession of a weapon (for possessing the shotgun and the rifle). Finally, the indictment charged Mills with one count of third degree possession of marijuana with respect to the 1.27 pounds of that substance found in his house.

Mills appeared in Genesee County Court before County Court Judge Robert Noonan on November 6, 2003, and informed the court that he was firing his attorney. He also demanded a competency examination pursuant to C.P.L. § 730.30. *See* Resp't Ex. U at 5; Transcript of November 6, 2003 Pre-Trial Hearing ("11/06/03 Tr.") at 2-4, 7.[3] Defense counsel informed the

---

[1]  The documents referred to as Respondent's Exhibits are attached to Respondent's Declaration in Opposition to the Petition (Docket ("Dkt.") #32).

[2]  In New York, a defendant charged with a class A felony is statutorily prohibited from waiving indictment and proceeding under a superior court information. *See* N.Y. CRIM. PROC. LAW § 195.10(1)(b).

[3]  Hereinafter, citations to the transcript of any pre-trial or post-trial hearing will be in this form, with the date of the hearing followed by "Tr." and the page number(s).

court that such an examination was unnecessary, and the prosecutor indicated that a competency examination had been done previously in connection with the first indictment. According to the prosecutor, that examination had shown petitioner was competent to stand trial. *See* Resp't Exs. T at 119 & U at 5; 11/06/03 Tr. at 7-8. On December 17, 2003, while Mills' court-assigned counsel was present, Mills appeared with a new retained attorney, Felix Lapine, Esq., for arraignment. *See* Resp't Ex. U at 5; 12/17/03 Tr. at 2-3. Mills again requested a competency examination, but attorney Lapine stated that there was no need for such an examination. *See* Resp't Ex. U at 5; 12/17/03 Tr. at 5-6.

Attorney Lapine filed a pre-trial omnibus motion on January 12, 2004, requesting, *inter alia*, suppression of all property and statements taken from petitioner, and dismissal of counts seven and eight alleging criminal possession of a weapon because the indictment mistakenly cited "Penal Law § 165.02," which does not exist. Defense counsel also sought dismissal of the remaining counts of the indictment, except for count nine relating to the marijuana possession. *See* Resp't Ex. T at 10-29. At the suppression hearing held on March 19, 2004, attorney Lapine argued that Mills had standing to assert a Fourth Amendment challenge to the seizure of the guns from his father's house. 3/19/04 Tr. at 3-5. Judge Noonan denied the suppression motion in its entirety in a written decision filed March 26, 2004. In particular, the trial court found that petitioner had no privacy interest in his father's house, and that the reference to Penal Law § 165.02 in counts seven and eight was a "scrivener's error" and could be amended to read Penal Law § 265.02 through a special information. *See* Resp't Ex. T at 101-04.[4]

---

[4] A special information was filed in due course by the prosecutor on March 29, 2004, stating that Mills had been convicted in Genesee County of second degree criminal use of drug paraphernalia (P.L.§ 220.50) on October 21, 1991, and of driving while intoxicated (Vehicle and Traffic Law ("V.T.L.") § 1192-3) on April 24,

Mills, through defense counsel, then filed a motion seeking to have Judge Noonan recuse himself on the basis that he had a prior business relationship with Genesee County District Attorney prosecuting Mills' case. *See* Resp't Ex. T at 48-50. Judge Noonan ruled that although he had previously practiced law with the district attorney and in private practice, his business relationship had been severed long before he became a judge. Therefore, he denied Mills' recusal motion. *See* Resp't Ex. T at 105-06.

On April 24, 2004, defense counsel for Mills filed a late notice of intent to offer psychiatric evidence but did not state what type of defense would be offered or what issues would be involved. Oral argument on the motion was held on May 18, 2004, before Judge Noonan. *See* Resp't Ex. T at 51, 61-62; 5/18/04 Tr. at 3-5. During further argument on May 25, 2004, the trial court stated that it had received letters from Mills complaining about attorney Lapine's representation and stating that he still wanted a C.P.L. § 730.30 examination. After hearing extensively from both parties, the trial court ordered a C.P.L. § 730.30 examination and reserved decision on defense counsel's request to file a late notice of intent to offer psychiatric evidence until after the competency exams. *See* Resp't Ex. U at 5-6; 5/25/04 Tr. at 2-17.

Mills was examined on July 19 and July 24, 2004, by two different psychiatrists. Both doctors noted in their reports that Mills had a history of alcohol/chemical substance dependency and mental illness, including treatment for bipolar disorder from 1998-1999. Also, five days before the incident, Mills had been prescribed new medication for his bipolar disorder. Notwithstanding his history and present diagnosis, both psychiatrists concluded, Mills was

---

2001, making him eligible for third degree criminal possession of a weapon under P.L. § 265.02(1), which requires commission of fourth degree criminal possession of a weapon, under P.L. § 265.01(2), after having been previously convicted of any crime. *See* Resp't Ex. T at 47.

mentally competent to stand trial. *See* Resp't Ex. T at 131-38.

At a subsequent pre-trial hearing held on August 25, 2004, the trial court noted that "both psychiatric examiners f[ou]nd the [petitioner] to be competent." 8/25/04 Tr. at 3; Resp't Exs. S at 16 & T at 119, 121-22. Mills voiced an objection to the reports on the basis that he believed the psychiatrists had used his medical records without obtaining his signed consent. He also asked that attorney Lapine be relieved from representing him, and requested new assigned counsel. 8/25/04 Tr. at 3-6; Resp't Exs. S at 16 & U at 6. Judge Noonan, after hearing from Mills and attorney Lapine on the issue, and noting the tension between them, relieved Lapine and indicated that he would assign new counsel. 8/25/04 Tr. at 6-10; Resp't Exs. S at 16 & U at 6-7.

On September 7, 2004, Mills appeared with newly assigned counsel David Morabito, Esq., and the trial court indicated that it would adjourn the proceedings to allow Mills to decide whether attorney Morabito would act as his trial counsel or as standby counsel. 9/07/04 Tr. at 2-6; Resp't Exs. S at 16 & U at 6-7. Mills also inquired as to what Judge Noonan "was going to do about the 730 evals [sic]." 9/07/04 Tr. at 6-7; Resp't Ex. U at 6. Mills subsequently elected to have attorney Morabito act as his trial counsel. 9/13/04 Tr. at 2-3.

At the September 13, 2004 court appearance, Judge Noonan raised the issue of Mills' letter claiming that attorney Lapine had not received advance notice of the C.P.L. § 730.30 exams. Attorney Morabito informed the judge that notice and his client's competence were no longer in issue. 9/13/04 Tr. at 9-12; Resp't Ex. U at 6. Defense counsel also argued that he should be allowed to file a late notice of intent to present a psychiatric defense on the basis that the newly prescribed drug Topamax® caused Mills' psychosis at the time of the incident. *Id.* at 4-9.

A week later, on September 20, 2004, counsel for Mills filed a supplemental omnibus motion requesting, *inter alia*, suppression of all statements made by Mills and of the evidence illegally seized from the house, leave to file a late notice of intent to offer psychiatric evidence, and severance of count nine of the indictment involving marijuana possession. *See* Resp't Ex. T at 71-74. At oral argument, attorney Morabito contended that the psychiatric evidence would show that Mills lacked the requisite intent to commit the crimes. 9/30/04 Tr. at 2-12. On October 5, 2004, Judge Noonan court summarily denied the remainder of petitioner's motion, but it granted Mills permission to file a late notice of intent to offer psychiatric evidence, provided that Mills consent to be examined by a psychiatrist designated by the prosecutor. *See* Resp't Ex. T at 114-15.

**B.     The Trial**

Mills' jury trial commenced on November 15, 2004, before Judge Noonan. The prosecution presented testimony that on December 20, 2001, Genesee County Sheriff's Office Deputies responded to petitioner's father's house on Griswold Road near the Town of Stafford. T.280-83, 343-44.[5] They were responding to two 911 calls, one of which had been made by Jim Hardigan, a manager at Griffith Oil Company. Hardigan reported that a customer with mental health problems (Mills) had threatened Hardigan's life over the phone because the company had repossessed, for non-payment, Mills' propane tank regulators. *See* Resp't Ex. T at 154-55. Mills' father, Elmer Mills, had also called 911 to say that his son was bipolar, had recently been prescribed new medication, and was "flippin['] out" after Griffith Oil had repossessed the propane regulators. *See id.* at 156-58. Mills' father informed the 911 operator that Mills had

---

[5]          Citations to "T.__" refer to the trial transcript.

consumed some alcohol and smoked some marijuana. In addition, Mills had recently threatened to commit suicide, was in possession of a loaded rifle and a loaded shotgun, and intended to shoot any sheriff's deputy who came to the house. *See id.* at 156-59; *see also* T.280.

Three deputies arrived on the scene: Investigator Roger Stone ("Inv. Stone"), Deputy John Weis ("Dep. Weis"), and Deputy John Duyssen ("Dep. Duyssen"). Dep. Duyssen was a friend of petitioner's family, who came over at Mills' request. Mills vowed to shoot anyone other than Dep. Duyssen who approached the house. *See* Resp't Ex. T at 163-64; T.280-82, 340-45. Dep. Duyssen spoke to Mills via cell phone; Mills informed him that he had some loaded guns with him. He gave Dep. Duyssen, who was unarmed and in civilian clothes, permission to enter the house to talk as long as Duyssen was unarmed and the other deputies did not come in. *See* Resp't Ex. T at 163-64, 167-68; T.290-91, 343-47.

Once inside, Dep. Duyssen found Mills seated at a table with a loaded shotgun, some ammunition, and a whiskey bottle in front of him, and a rifle leaning against the wall. T.345-47, 358. Dep. Duyssen sat down and Mills told him that he was bipolar, had smoked some "dope," but not crack cocaine, and was "distraught" because his wife had left him and he was in financial trouble, culminating in the repossession of his propane tank regulators. *See* Resp't Ex. T at 169-70; T.345-46.

Meanwhile, Inv. Stone had positioned himself with Dep. Weis about 100 yards away from the house. T: 280-82, 290-92, 306, 314. (Although Inv. Stone had a "beanbag shotgun" and a ballistics shield, the shield could have been penetrated by the high-powered rifle petitioner had with him.) As Dep. Duyssen and Mills talked about Mills' concern that he would be arrested for having threatened to "shoot up" Griffith Oil if they did not return his regulators, Mills spied Inv.

Stone approach closer to the house and poke his head outside the ballistics shield. T.347, 349-51, 353. Exclaiming that he was "gonna shoot 'em in the head," Mills grabbed the rifle and pointed it at Inv. Stone through the open window of the house such that the barrel was outside. T. 294, 347-48, 351, 353. According to Dep. Duyssen, Mills assumed a "shooter's stance," putting his eye up to the scope of the rifle, and "his hand was going on the trigger." T.352. Dep. Duyssen then grabbed the barrel of the rifle, pulled it back around, and struggled with Mills for control of the gun. T.294, 351-60. Dep. Duyssen managed to push Mills down into a chair, but petitioner grabbed the shotgun from the table with his free hand, forcing Dep. Duyssen to grab that weapon as well. Dep. Duyssen related that he was then holding the barrels of both guns up against his chest. T.355, *see also* T.347-48, 350-56. Mills started yelling, and Dep. Duyssen shouted to Inv. Stone that "[it] wasn't going well, [and] to get in here." Inv. Stone and Dep. Weis rushed into the house. T.294-95, 356.

Inv. Stone was able to get petitioner's hand off the shotgun, and Dep. Weis, who had his own shotgun in his right hand, put his left hand over Dep. Duyssen's hands on the barrels of both guns, which were pointing above Dep. Weis's head. T.295-96, 410-11. Mills, who had the rifle in his hand, exclaimed that the "safe's off," T.358. Then a shot "rang off," striking the ceiling. T.295-96, 304-05, 353-60, 411. At that point, the barrels of both guns still were directly in front of Dep. Duyssen's face; he indicated that it would have taken only "a fraction of a twist or pull" for the rifle to "have blown [his] head off." T.359-60. The deputies were then able to subdue petitioner. T.297, 304-05, 353-60.[6]

---

[6]     When Dep. Duyssen and Dep. Weis attempted to unload the loaded rifle, Dep. Duyssen accidentally jammed it. T.360-61, 412, 419-20. However, Inv. Stone later was able to test-fire the shotgun along with the rifle after it had been put back together and made operable. T.298-304.

After taking Mills' back to his father's house to retrieve his medications, the deputies found "marijuana everywhere" in the house. T.363. The seized drugs totaled 1.27 lbs. T.362-63, 427-29, 443-44. Inv. Stone, Dep. Duyssen and Dep. Weis all testified, however, that they did not believe that petitioner had been intoxicated or under the influence of drugs during the incident. T.333, 364, 413.

The first witness for the defense was Robert Chapman ("Chapman"), a neighbor and family friend. Chapman testified that Mills had called him on the day of the incident to tell him to get to Mills' father's house right away. T.471-72, 506. When Chapman arrived and realized what was going on, he asked the deputies to let him try to calm petitioner down, but this request was refused. T.472-73. Chapman testified that he had seen Mills in his father's garage the day before, looking "very depressed." They had talked about a mutual friend who had recently committed suicide. T.474-76, 479-82.

Petitioner's mother, Joanne Mills ("Mrs. Mills"), testified that she had seen petitioner the day before the incident looking "very irritable" and "real depressed." Mrs. Mills explained that her son would get "confused at times" when he was "really depressed." T.493-95. Mrs. Mills stated that Mills had first attempted suicide when he was about seven years old; after this incident, he had been taken to a psychiatric center, and had taken psychiatric medication for awhile. T.497-98. After another suicide attempt in 1999, Mills spent about ten days in the psychiatric center, and had been seeing a psychiatrist since then on an outpatient basis. T.499. Mrs. Mills stated that her husband had taken Mills to the psychiatrist about a week before the incident, because he had been threatening to commit suicide again. At that appointment, Mills was prescribed new medication. T.499-500.

Mills did not testify in his behalf at trial.

On November 17, 2004, the jury returned a verdict acquitting petitioner of the charges of attempted first degree murder and attempted first-degree assault counts involving his firing of the rifle near Deputies Duyssen and Weis, as well as the alternative lesser-included attempted second degree murder charge. However, the jury found him guilty of first degree reckless endangerment charge involving those deputies, and of the remaining counts of attempted first degree murder and attempted first degree assault for aiming the rifle at Inv. Stone. In addition, the jury convicted Mills of the counts of third degree criminal possession of a weapon and third degree criminal possession of marijuana. T.668-70.

At the sentencing hearing on December 16, 2004, defense counsel for Mills moved to set aside the verdict pursuant to C.P.L. § 330.30 on the attempted first-degree murder conviction and requested that the trial court impose the minimum sentence possible based on his client's psychiatric problems. 12/16/04 Tr. at 2, 4-6. Judge Noonan declined to entertain the motion. *Id.* at 6. Defense counsel renewed his motion for recusal, now alleging that the judge's familial relationship as cousins within the sixth degree of kinship to assistant district attorneys Robert and William Zickl created a basis for recusal.[7] *Id.* at 6-7. Judge Noonan denied the recusal motion. He then sentenced petitioner to an aggregate term of twenty years to life in prison, specifically sentencing him to (1) an indeterminate term of twenty years to life imprisonment for the attempted first degree murder charge; (2) a determinate fifteen-year prison term for the attempted first degree assault charge; (3) an indeterminate sentence of two and one-third to seven years for

---

[7]     Neither of these individuals had any role in the investigation or prosecution of the criminal case against Mills.

the reckless endangerment charge; (4) two concurrent indeterminate terms of two and one-third to seven years for the two third degree criminal possession of a weapon charges; and (5) an indeterminate term of one and one-third to four years for the third degree criminal possession of marijuana charge. The sentences for the reckless endangerment charge were served consecutively to the two concurrent terms for the weapons possession charges, which in turn were served consecutively to the drug charge. These four sentences were set to run concurrently with the first two prison terms (for the attempted murder and attempted assault charges). *See* 12/16/04 Tr. at 8-9.

### C. Post-Conviction Proceedings

Before filing his direct appeal, Mills filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10 on February 23, 2005. *See* Resp't Ex. A. Mills argued that his pre-trial and trial attorneys were ineffective on numerous grounds. Mills further alleged that the trial court lacked jurisdiction because the judge improperly refused to recuse himself due to his familial relationship with assistant district attorneys William and Robert Zickl; the trial judge was biased and "altered" pre-trial discovery and the bill of particulars; the indictment was defective; the jury was improperly instructed on intent, attempt, and overt acts; his statements made while in police custody should have been suppressed; the verdicts were inconsistent and repugnant; and his speedy trial right was violated. *See id.* at 4-17; *see also* Resp't Exs. B & C.

On June 2, 2005, Judge Noonan denied the C.P.L. § 440.10 motion without a hearing. *See* Resp't Ex. D. Judge Noonan rejected the recusal claim, reiterating that his business relationship with the prosecuting district attorney had been severed well before the time he was sworn as a judge. *See id.* at 2. Although the judge acknowledged that he was related within the fifth degree

of kinship[8] to assistant district attorneys William and Robert Zickl, Section 100.3(E)(1)(e) of the Rules of the Chief Administrator only required disqualification when *an attorney appearing before the court* is related to the judge within the fourth degree. *Id.* at 2-3.[9] Judge Noonan also rejected any request for discretionary recusal based upon any "potential appearance of partiality or impropriety," because petitioner offered "[n]othing but unfounded castigation and speculation" to support his claim that the court was biased in favor of the District Attorney based upon those familial relationships. *See* Resp't Ex. D at 3. Judge Noonan rejected the claim that the trial court lacked jurisdiction and that trial counsel was ineffective in failing to call a psychiatric expert, noting that Mills had offered nothing but speculation that the potential witnesses would have testified to support his defense that he was unable to form intent. *See id.* at 3-4. Finally, Judge Noonan summarily rejected petitioner's claims that counsel was ineffective for failing to cross-examine the sheriff's investigator who had transported the seized evidence, as well as Mills' claims involving the sufficiency of the indictment, the propriety of the jury instructions, the admissibility of his statements to the police, trial counsel's overall effectiveness, the repugnancy of the verdict, and the violation of his speedy trial right because they were all issues that could be addressed on direct appeal. *See id.* at 4; N.Y. CRIM. PROC. LAW § 440.10(2)(c). On May 3, 2006, the Appellate Division denied petitioner's C.P.L. § 440 leave application. *See* Resp't Exs. E, F & G. His application for leave to appeal to the New York Court of Appeals was

---

[8]    For purposes of determining judicial disqualification based on consanguinity, the "degree shall be ascertained by ascending from the judge to the common ancestor, descending to the party, counting a degree for each person in both lines, including the judge and party, and excluding the common ancestor." N.Y. Judiciary Law § 14.

[9]    Though the trial court did not explain, it is apparent that this rule was not applicable here also because the District Attorney himself prosecuted the case. *See* T.1.

dismissed on May 26, 2006, because the order appealed from was unappealable as a matter of

New York law. *See* Resp't Exs. H & I.; N.Y. Crim. Proc. Law § 450.90(1). Mills filed a

second *pro se* C.P.L. § 440.10 motion on October 3, 2005, asserting a raft of new errors. *See*

Resp't Ex. J. On October 20, 2005, the trial court denied the second C.P.L. § 440 motion without

a hearing, *see* Resp't Ex. L, finding that most of petitioner's claims were amenable to direct

review on appeal, *see* N.Y. Crim. Proc. Law § 440.10(2)(c). Judge Noonan further found that

Mills' claims as to his state of psychosis, and the purported misconduct of the court and the

prosecutor, were "entirely unsubstantiated on the instant record." *See id.* at 2. The Appellate

Division denied leave to appeal. *See* Resp't Exs. M, N & O. The New York Court of Appeals

dismissed Mills' application for leave to appeal because the Appellate Division order was not

appealable. *See* Resp't Exs. P, Q & R; N.Y. Crim. Proc. Law § 450.90(1).

   In the meantime, Mills was assigned new counsel, Del Atwell, Esq., to assist him in

connection with his direct appeal. Attorney Atwell filed a brief in the Appellate Division arguing

that (1) there was no finding on the record that Mills was mentally competent; (2) the evidence in

support of the attempted murder counts was insufficient and against the weight of the evidence,

and the trial court erred in denying the C.P.L. § 330.30 motion to set aside the verdict because

petitioner's mental state and diminished capacity rendered him incapable of forming intent; and

(3) the sentence was excessive. *See* Resp't Ex. S at 16-40 (Petitioner's Appellate Brief). Not

satisfied with the brief appellate counsel had submitted, Mills subsequently filed a *pro se*

supplemental brief alleging fourteen additional claims. *See* Resp't Mem. at 17-18; Resp't Ex. V

at 6-45. The prosecutor filed responses to both briefs *See* Resp't Exs. U & W. Petitioner filed a

reply (Resp't Ex. X) to the prosecutor's brief opposing his *pro se* brief.

On April 28, 2006, the Appellate Division unanimously affirmed petitioner's conviction in a memorandum, decision, and order. *People v. Mills*, 28 A.D.3d 1156 (App. Div. 4th Dept. 2006). Mills submitted a *pro se* letter in which he sought leave to appeal the Appellate Division's decision. *See* Resp't Ex. Z. The prosecution opposed the granting of leave. *See* Resp't Ex. BB. On November 30, 2006, the New York Court of Appeals denied petitioner's leave application. *People v. Mills*, 7 N.Y.3d 903 (N.Y. 2006).

Next, on January 14, 2006, petitioner filed a *pro se* application for a writ of error *coram nobis*. He demanded, among other things, that the Appellate Division strike the appellate brief filed by his assigned counsel, appoint new counsel, and revoke appellate counsel's law license. *See* Resp't Ex. DD at 1. Petitioner claimed that attorney Atwell, his assigned appellate counsel, was ineffective on numerous grounds, and alleged that he operated under a conflict of interest since he was appointed by a member of Judge Noonan's "political gang," namely, Randolph Zickl, who was the Genesee County Assigned Counsel Administrator for the Fourth Department, and the brother of assistant district attorneys Robert and William Zickl. The prosecutor filed an opposing affirmation in response and petitioner filed a reply. *See* Resp't Exs. EE & FF, respectively. On February 22, 2006, the Appellate Division denied petitioner's *coram nobis* motion. *See* Resp't Ex. GG. Petitioner filed a *pro se* application on February 27, 2006, in which he sought leave to appeal to the New York Court of Appeals, and argued the same issues raised in his motion before the Appellate Division. *See* Resp't Ex. HH. On April 7, 2006, leave to appeal was denied.  *See* Resp't Ex. II.

Mills filed a third *pro se* C.P.L. § 440.10 motion to vacate the judgment on May 30, 2006, raising yet another exhaustive list of claims which included allegations that his trial

counsel erroneously failed to call the court-appointed psychiatrist to testify to petitioner's affirmative defense of extreme emotional disturbance and refused to move to dismiss the marijuana possession count. *See* Resp't Ex. JJ. The prosecution filed an affirmation in response. *See* Resp't Ex. KK. On August 28, 2006, Judge Noonan denied this C.P.L. § 440.10 motion without a hearing because all of petitioner's claims either were, or could have been, raised in his prior C.P.L. § 440.10 motions or in his direct appeal. *See* Resp't Ex. LL at 1-2 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(a), (c)). Leave to appeal was opposed by the prosecution and ultimately denied by the Appellate Division on February 5, 2007. *See* Resp't Exs. MM, NN, & OO.

### D. The Instant Habeas Petition

While Mills' third C.P.L. § 440.10 motion was pending, he commenced this habeas corpus proceeding. In his petition dated December 16, 2006, petitioner repeats his claims made in his *pro se* supplemental appellate brief (1) there was legally insufficient evidence to support attempted first degree murder and assault charges; (2) the indictment was defective; (3) the verdicts were inconsistent; (4) there was improper joinder of count nine; (5) there was excessive force used during his arrest; (6) the trial court erred in admitting evidence of the rifle without also admitting the lab report showing that it was nonfunctional when first received; (7) the Genesee County officials, Judge Noonan, the District Attorney, his trial attorneys Morabito and Lapine, and the sheriff's deputies and investigator all conspired to cover up the illegally-seized evidence and his mental health issues, in violation of 18 U.S.C. §§ 1503, 1505, 241, 242; (8) his Fourth Amendment rights were violated by the illegal search and seizure of marijuana from his home, the admission of his statements, the 911 tapes, and his confession without notice or a hearing, and by the trial court's erroneous ruling that he had no standing to challenge the seizure of the

guns in his father's house; (9) Judge Noonan should have recused himself; (10) his Sixth Amendment right to a speedy trial was violated; (11) his pre-trial and trial attorneys were ineffective, with respect to attorney Lapine for (a) getting sick and making failed attempts to file a notice of intent to offer psychiatric evidence; (b) failing to move to suppress the marijuana evidence; (c) failing to challenge the improper joinder of count nine under C.P.L. § 200.20; and with respect to attorney Morabito for failing to (a) call a medical expert to present his intoxication and mental health defense; (b) object to the admission of his statements at trial; (c) object to the People's use of Inv. Stone as a "ballistics expert" or the Monroe County Public Safety Laboratory Report; (d) cross-examine Inv. Stone as to the operability of the weapons, and the other officers as to the chain of custody; (e) call his father as a witness or to question Robert Chapman as to the inoperability of the rifle; and for (f) conspiring with the judge and the District Attorney to conceal witnesses relating to petitioner's mental condition during the first few days he was incarcerated, weapon expert testimony, and evidence of his intoxication and mental health problems; (g) attempting to coerce petitioner to plead guilty; and (h) failing to request a missing witness charge for the weapons expert, the medical examiner, and his father. Finally, Mills claims that (12) the Appellate Division deprived him of his right to appeal by appointing appellate counsel who was ineffective. *See* Pet. at 12-36 (Dkt. #1).

Respondent filed an answer (Dkt. #32-1) and memorandum of law (Dkt. #32-43) in opposition to the petition. Respondent does not challenge the timeliness of the petition but` asserts that a number of Mills' claims are unexhausted and procedurally defaulted. *See* Respondent's Memorandum of Law ("Resp't Mem.") (Dkt. #32-43). Respondent also argues that all of Mills' claims are entirely without merit. Mills subsequently filed a reply brief (Dkt. #66).

Mills has sought various forms of interlocutory relief and judgment on the pleadings; all of these motions, save for his motion to seal certain documents, were denied as meritless. The matter is now fully briefed and ready for decision. For the reasons that follow, I recommend that the petition be dismissed and that no certificate of appealability issue with regard to any of Mills' claims

## III.    General Legal Principles

Federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Errors of state law are not subject to federal habeas review. *E.g.*, *Estelle v McGuire*, 502 U.S. 62, 67-68 (1991). Thus, to be entitled to habeas relief, a petitioner must demonstrate that his conviction resulted from a state court decision that violated federal constitutional law. *Id.* at 68.

With regard to an exhausted federal claim that has been adjudicated on the merits in the state court, habeas relief is unavailable unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

## IV.    Analysis of the Claims Raised in the Petition

### A.    Petitioner's insufficiency of the evidence claim is procedurally barred and is, in any event, without merit.

On direct appeal, the Appellate Division stated that "[petitioner] failed to renew his

challenge to the legal sufficiency of the evidence after he presented evidence and thus failed to preserve for our review his contention that the conviction [wa]s not supported by legally sufficient evidence . . . and his posttrial motion pursuant to C.P.L. 330.30 [wa]s insufficient to preserve his present contention for our review." *People v. Mills*, 28 A.D.3d at 1157 (citations omitted). It further explained that, "[i]n any event, [petitioner's] contention lacks merit, as does [petitioner's] further contention that the verdict [wa]s against the weight of the evidence." *Id.* (citations omitted).

Respondent argues that the Appellate Division's reliance upon a state procedural rule to dismiss the claim that the evidence was legally insufficient to prove the attempted first degree murder and assault charges involving Inv. Stone constitutes an "adequate and independent" state ground precluding federal habeas review of the claim. *See* Resp't Mem. at 28-29 (Dkt. #32-43) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Harris v. Reed*, 489 U.S. 255, 260-61 (1989)). I agree.

Here, the Appellate Division's decision contained a "plain statement" that the issue was "unpreserved", which is sufficient to indicate that it was relying on a procedural bar; the result is not altered even if, as here, the state court also rejected the claim on the merits in the alternative. *See Harris*, 489 U.S. at 264 n.10 (stating that "a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision); *accord, e.g.*, *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (When a state court finds that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved for federal habeas review.).

The New York Court of Appeals clearly has held that the contemporaneous objection

rule, *see* C.P.L. § 470.05(2), requires that a motion to dismiss alert the trial court to the specific

deficiency alleged in order to preserve an insufficiency of the evidence claim for appeal. *People*

*v. Gray*, 86 N.Y.2d 10, 19 (N.Y. 1995). Moreover, when a defendant presents evidence after the

trial court has declined to grant a motion to dismiss under C.P.L. § 290.10(1) following the close

of the prosecution's case, he waives his Section 290.10(1) claim. He may not present a legal

insufficiency argument through a C.P.L. § 330.30 motion to set aside the verdict unless it has

been properly preserved for review during the trial by renewing his motion to dismiss at the close

of *all* the evidence. *People v. Hines*, 97 N.Y.2d 56, 61-62 (N.Y. 2001);[10] *see also People v.*

*Harris*, 98 N.Y.2d 452, 492 (N.Y. 2002). Thus, without a doubt, the procedural rule relied on by

the Appellate Division constituted an "independent" state law ground for its decision dismissing

petitioner's insufficiency claim as unpreserved, because petitioner failed to renew his motion

after he presented evidence.

     I also agree with respondent that the rule relied upon by the Appellate Division was

"firmly established and regularly followed state practice," *see*, *e.g.*, *People v. Lane*, 7 N.Y.2d

888, 889 (N.Y. 2006), sufficient to satisfy the "adequate" prong of the "adequate and

independent" test. *See Lee v. Kemna*, 534 U.S. 362, 376 (2002); *accord Garvey v. Duncan*, 485

F.3d 709, 713-14 (2d Cir. 2007). In determining adequacy of a state procedural bar, the Second

Circuit has looked at (1) whether the alleged procedural violation was actually relied on in the

state court, and whether perfect compliance with the state rule would have changed the state

---

[10] A court adjudicating a C.P.L. § 330.30 motion to set aside the verdict may consider only issues of law which "would require a reversal or modification of the judgment as a matter of law by an appellate court." N.Y. CRIM. PROC. LAW § 330.30(1)). Under this statutory standard, an insufficiency argument may not be addressed unless it has been properly preserved for review during the trial. *See People v. Hines*, 97 N.Y.2d at 61-62.

court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee*, 534 U.S. at 386-87).

Here, the rule was "actually relied upon" by the state courts, and it appears that had petitioner complied, the courts would have entertained his insufficiency claim on the merits rather than dismissing it as unpreserved. However, the trial court was not given the opportunity to address petitioner's motion to dismiss based on insufficiency during trial, and found that Mills' C.P.L. § 330.30 motion at sentencing was insufficient for preservation purposes. 12/16/04 Tr. at 4-6.

As for the second factor, "state caselaw indicate[s] that compliance with the rule was demanded in the specific circumstances presented," *Cotto*, 331 F.3d at 240, for it is well established as a matter of New York law that a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, "proceeds with the risk that he will inadvertently supply a deficiency in the People's case," and waives subsequent review of that determination. *People v. Hines*, 97 N.Y.2d at 61 (citing, *inter alia*, *People v. Kirkpatrick*, 32 N.Y.2d 17, 21 (N.Y. 1973)). The "rationale underlying this rule is that a reviewing court should not disturb a guilty verdict by reversing a judgment based on insufficient evidence without taking into account all of the evidence the jury considered in reaching that verdict, including proof adduced by the defense." *Id.* This specific preservation rule requiring renewal of a motion appears analogous to case law holding that a general motion to dismiss fails to preserve a specific

claim of insufficiency as to a specific count. *See*, *e.g.*, *People v. Lane*, 7 N.Y.3d at 889.

As to the third *Cotto* factor, it is clear that Mills did not make an effort to "substantially" comply with this rule, for he failed to renew his motion to dismiss at the close of all the evidence. *Cotto*, 331 F.3d at 240. Although trial counsel made a motion to dismiss after the close of the prosecution's direct case, and the court reserved decision until after the defense case, trial counsel failed to renew his motion after the close of all the evidence. *See* T.454-62, 464, 503-04.

Consideration of the relevant factors weighs in favor of finding that the procedural bar rule, as applied by the state courts in Mills' case, was "adequate" to preclude federal habeas review. *Cf. Evans v. Sewkowski*, No. 03-CV-416S, 2006 U.S. Dist. LEXIS 69026, at *15-16 (W.D.N.Y. Sept. 26, 2006) (Skretny, D.J.) (finding the invocation of the state procedural bar rule to be adequate even where petitioner's trial counsel made a general motion to dismiss at the end of the prosecution's case, and, after the defense rested, "simply sought simply sought to 'renew the motions [he] made earlier"; trial counsel failed to argue any specific rationale in support of either application).

A finding of procedural default will "bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citation omitted); *accord*, *e.g.*, *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000). To demonstrate a "fundamental miscarriage of justice," a petitioner must demonstrate "actual innocence." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998); *accord Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). On the instant record, Mills is unable to establish cause for the default or prejudice

attributable thereto. Furthermore, Mills has not come forward with new evidence tending to demonstrate that he is factually innocent, and so cannot fulfill the requirements of the "fundamental miscarriage of justice" exception. Accordingly, I recommend dismissing this claim on the basis that it is subject to an unexcused procedural default.

In the alternative, the legal insufficiency claim may be dismissed on the merits. A habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of his state criminal conviction. *Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 840 (2d Cir. 1997). Under the clearly established law set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court must view the trial evidence in the light most favorable to the prosecution and uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). The reviewing court is required to defer to the fact-finder's assessment of the strength of the evidence and credibility of the witnesses and may not substitute its view of the evidence for that of the fact-finder. *Id.*; *accord*, *e.g.*, *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

In evaluating the sufficiency of the evidence to support Mills' state-court conviction, I "'must look to state law to determine the elements of the crime.'" *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999), *cert. denied*, 528 U.S. 1170 (2000)). Here Mills has only challenged the legal sufficiency of the evidence supporting the (1) attempted first degree murder conviction involving Inv. Stone and (2) the assault conviction involving Inv. Stone. To establish Mills' guilt of attempted first degree

murder, the prosecution had to prove that, "with intent to commit"[11] a crime, petitioner

"engage[d] in conduct which tend[ed] to effect the commission" of first degree murder of a

police officer. The elements of this crime are as follows: the defendant, with "intent to cause the

death of another person, . . . causes the death of such person . . ." and the "intended victim was a

police officer as defined in" C.P.L. § 1.20(34), and "who was at the time of the killing engaged in

the course of performing his official duties, and the defendant knew or reasonably should have

known that the intended victim was a police officer." N.Y. PENAL LAW §§ 110.00,

125.27(1)(a)(i). To establish the elements of attempted first degree assault, the prosecution must

to prove that the defendant, "with intent to commit" a crime, "engage[d] in conduct which

tend[ed] to effect the commission" of first degree assault. First degree assault requires that a

person with "intent to cause serious physical injury to another person" caused such injury "by

means of a deadly weapon or dangerous instrument." N.Y. PENAL LAW §§ 110.00, 120.10(1).

"Serious physical injury" is defined as physical injury which creates a "substantial risk of death,

or which causes death. . . ." N.Y. PENAL LAW § 10.00(10). Finally, a "deadly weapon" includes

"any loaded weapon from which a shot, readily capable of producing death or other serious

physical injury, may be discharged. . . . ." N.Y. PENAL LAW § 10.00(12).[12]

---

[11] Under New York law, a "person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." N.Y. PENAL LAW § 15.05(1).

[12] As an initial matter, there is no dispute that Inv. Stone, of the Genesee County Sheriff's Office, qualified as a police officer. *See* T. 278-79; N.Y. CRIM. PROC. LAW § 1.20(34)(b). Nor is there any dispute that at the time of the attempted murder Inv. Stone was engaged in his official duties; that he was responding to the 911 call at petitioner's father's house, and that petitioner knew that Inv. Stone was a police officer. *See* Resp't Ex. T at 167-68; T.280-81, 344-45. The rifle qualified as a "deadly weapon," in that it was loaded and capable of producing death or other "serious physical injury" to Inv. Stone had he been shot at through the ballistics shield. *See* T.306, 419. Viewing the evidence in the light most favorable to the prosecution, the prosecution established beyond a reasonable doubt the preliminary elements for attempted first degree murder and assault because petitioner used the rifle, a "deadly weapon," which was clearly capable of causing death or serious physical injury when he pointed it at Inv.

With regard to the element of intentionally engaging in conduct which constituted an attempt to intentionally cause death or serious physical injury to a police officer, "[i]ntent may be inferred from [petitioner's] conduct and the surrounding circumstances." To be found guilty of "attempt," a defendant must have "engaged in conduct that came 'dangerously near' commission of the completed crime." *People v. Stoby*, 4 A.D.3d 766, 766-67 (App. Div. 4th Dept. 2004). A rational jury easily could have found that the prosecution proved beyond a reasonable doubt that petitioner, "with intent to commit" first degree murder of a police officer and first degree assault, "engage[d] in conduct which tend[ed] to effect the commission of"or "came dangerously near commission of" those completed crimes. When petitioner saw Inv. Stone approach closer to his father's house and stick his head outside his ballistics shield, he was heard by Dep. Duyssen to suddenly shout that he was "gonna shoot 'em in the head." Upon uttering that threat, Dep. Duyssen saw petitioner grab the loaded rifle and point it at Inv. Stone. *See* T.294, 347-48, 351-53. Mills aimed the rifle at Inv. Stone by pointing it out the open window with the barrel outside. He assumed a "shooter's stance," putting his eye up to the scope of the high-powered rifle, which was capable of penetrating Inv. Stone's ballistics shield, *see* T.290-92, 306, with "his hand . . . going on the trigger." T.351, 352.

After hearing petitioner's threat and seeing him start to carry it out, Dep. Duyssen grabbed the barrel of the rifle, and a struggle ensued. *See* T.294, 351-60. How close petitioner came to effecting the commission of the charged crime was shown by the fact that the rifle was loaded, petitioner had the rifle in his hand when he shouted that the safety was off, and the rifle was fired into the ceiling, narrowly missing the heads of Deputies Duyssen and Weis. *See*

Stone, whom petitioner knew was a police officer engaged in performing his official duties.

T.295-96, 304-05, 353-61, 412. Based on Mills' shouted threat that he was "gonna shoot 'em in the head," combined with his concomitant actions (i.e., pointing the rifle at Inv. Stone while in a shooter's stance with his eye on the rifle scope and moving his hand toward the trigger, a rational jury would have had little difficulty inferring that petitioner "came dangerously near [the] commission" of intending to cause death or serious physical injury to Inv. Stone. Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for the jury to infer from petitioner's conduct and the surrounding circumstances that petitioner had engaged in conduct which tended to effect the commission of both first degree murder and first degree assault. Thus, under the *Jackson v. Virginia* standard, the evidence should be found to be legally sufficient to support petitioner's attempted first degree murder and attempted first degree assault convictions. Accordingly, I recommend that in the alternative, the legal insufficiency claim be denied as without merit.

### B. Petitioner's claims alleging defects in the indictment, inconsistent verdicts, improper joinder, the use of excessive force by the sheriffs, the erroneous admission of evidence, and conspiracy should be dismissed as non-cognizable on federal habeas review.

Respondent argues that Mills' claims, raised in his *pro se* supplemental appellate brief (Resp't Ex. V at 6-13, 18-41), alleging (1) a defective indictment; (2) inconsistent verdicts; (3) improper joinder; (4) excessive force; (5) erroneous admission of evidence; and (6) conspiracy, are not cognizable on federal habeas review. *See* Pet. at 12-16, 21-34 (Dkt. #1).

### 1. Defective indictment

Mills contends that the indictment was factually insufficient under C.P.L. § 200.50(7)(a), because counts one through six merely recited the statutory language. *See* Pet. at 13-15 (Dkt. #1),

Resp't Ex. V at 9-10. This claim should be dismissed because it does not state a federal constitutional violation. The law is well settled that there is no federal constitutional right to indictment by a grand jury in a state criminal prosecution. *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) ("Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury."); *see also LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002) (noting that the Fifth Amendment's right to a grand jury indictment has not been incorporated against the states through the Fourteenth Amendment) (citations omitted). The New York Court of Appeals has recognized that "[t]he right to indictment by a Grand Jury in New York is dependent solely upon [the] State Constitution . . . ." *People v. Iannone*, 45 N.Y.2d 589, 594 n.3 (N.Y. 1978) (citation omitted).

Federal habeas relief is not available for mere violations of state law, however. *Estelle v. McGuire*, 502 U.S. at 67-68. Furthermore, federal courts have held that "[h]abeas corpus is not available to test the sufficiency of the indictment." *United States ex rel. Mintzer v. Dros*, 403 F.2d 42, 43 (2d Cir. 1967) (citing *United States ex rel. Tangredi v. Wallack*, 343 F.2d 752 (2d Cir. 1965) (citing *Knewel v. Egan*, 268 U.S. 442, 446 (1925)); *see also Marcus v. Conway*, No. 04 Civ. 0064 (JSR)(KNF), 2007 U.S. Dist. LEXIS 33411, at *11 (S.D.N.Y. Apr. 30, 2007) ("The petitioner's claim, that he had a constitutional right to be tried for robbery based on a grand jury indictment free of defect, does not provide a basis for habeas review because the claim does not present a federal question, as required by 28 U.S.C. 2254(a)."), *report and recommendation adopted by* 2007 U.S. Dist. LEXIS 48961 (S.D.N.Y. July 3, 2007). Likewise, claims based on alleged defects in grand jury proceedings are not cognizable in a federal habeas petition unless

they present an independent federal constitutional claim. *See Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989) ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in a federal court.").

Here, the indictment was sufficient to inform Mills of the charges against him since it recited the elements of the statute as well as the date, place, and alleged victim. Furthermore, it also had enough detail to allow him to plead double jeopardy. *See* Resp't Ex. T at 4-7. Thus, Mills has failed to demonstrate that there was an error of state law, let alone an error of federal constitutional law. *See De Vonish v. Keane*, 19 F.3d 107, 108 (2d Cir. 1994) (*per curiam*) ("An indictment is sufficient when it charges a crime (1) with sufficient precision to inform the defendant of the charges he must meet and (2) with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.") (citations omitted). Accordingly, Mills' claim that the indictment was defective because it allegedly merely recited the sections of the Penal Law and was factually insufficient under C.P.L. § 200.50(7)(a) should be dismissed as not cognizable and, in any event, meritless.

### 2. Inconsistent verdicts

Mills argues that the verdicts for his attempted first degree murder, attempted first degree assault, and reckless endangerment with regard to Inv. Stone were inconsistent with the not guilty verdicts involving Deputies Duyssen and Weis. *See* Pet. at 21-22 (Dkt. #1); Resp't Ex V at 18-19. This claim should be dismissed, however, because it is non-cognizable in this federal habeas proceeding.

It is well-settled that inconsistent jury verdicts are not a ground for federal habeas relief.

*See*, *e.g*, *Dowling v. United States*, 493 U.S. 342 (1990) (stating that "inconsistent verdicts are constitutionally tolerable"). In *United States v. Powell*, 469 U.S. 57 (1984), the Supreme Court explained that

> where truly inconsistent verdicts have been reached, [the] most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt . . . It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [other] offense.

*Id.* at 64, 65 (internal quotations omitted). *See also Harris v. Rivera*, 454 U.S. 339, 345 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside."). Even if this Court were to assume that the verdicts reached in Mills' case were inconsistent, that nevertheless does not provide a basis for habeas relief. *See United States v. Acosta*, 17 F.3d 538, 544-45 (2d Cir.1994) ("Even assuming that the verdict against Acosta was inconsistent with the verdicts as to his codefendants, we find no basis for relief, for it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty."). Accordingly, I recommend that the inconsistent verdicts claim be dismissed because it fails to state a federal constitutional question cognizable on habeas review.

### 3. Improper joinder

Mills argues that count nine of the indictment accusing him of criminal possession of marijuana was improperly joined with the remaining counts of the indictment. *See* N.Y. CRIM. PROC. LAW §§ 200.20, 210.20(1)(a); Pet. at 25-26 (Dkt. #1); Resp't Ex. V at 22-23. However, a claim of improper joinder of counts in an indictment ordinarily does not present a federal constitutional issue cognizable in a habeas petition absent a showing of *actual* prejudice. *See*

*Herring v. Meachum*, 11 F.3d 374, 377-78 (2d Cir. 1993) (stating that improper joinder amounts to a constitutional violation only if it "actually renders petitioner's state trial fundamentally unfair and hence, violative of due process"); *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986); *see also Spencer v. Texas*, 385 U.S. 554, 562 (1967) (holding that the convenience of trying different crimes against the same person in a single trial is a valid governmental interest and therefore justified under the United States Constitution). Where a defendant alleges a due process violation based upon joinder of offenses, "he must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial." *Herring*, 11 F.3d at 377-78. "[S]ubstantial prejudice does not simply mean a better chance of acquittal." *United States v. Alvarado*, 882 F.2d 645, 655 (2d Cir. 1989).

No prejudice is discernible on the record before this Court based on Mills' allegation of improper joinder. In fact, defense counsel indirectly used the allegations in count nine that Mills criminally possessed over a pound of marijuana to support the defense that Mills, as a result of drug use, lacked intent to attempt to assault or murder the officers. Furthermore, Mills was not prejudiced by the joinder with regard to the length of his aggregate prison term, since the sentence with regard to count nine was the shortest of all the sentences Mills received, and it was set to run concurrently to the longest sentence which were imposed for the top counts of the indictment. *See* S.8-9. Accordingly, I recommend that Mills' improper joinder claim be dismissed because he has failed to demonstrate "actual prejudice" so as to make the claim rise to a cognizable constitutional violation.

### 4. Claims of evidentiary error

Mills argues that his Fourteenth Amendment due process rights were violated by the trial

court's admission of the guns, shell casings, and a silhouette target with two holes on it, without permitting defense counsel to verbally enter on the record the lab report that the rifle was nonfunctional when it was first received. *See* Pet. at 15-16 (Dkt. #1); Resp't Ex. V at 11-13. "'[H]abeas corpus relief does not lie for errors of state law,' *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and that necessarily includes erroneous evidentiary rulings." *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006). As an initial matter, Mills' purported evidentiary challenge is lacking in a factual basis since the lab report that he complains should have been admitted into evidence actually was admitted into evidence by stipulation. *See* T.470, 504. The report in question indicated the rifle, when it was received by the lab, was nonfunctional due to improper assembly. However, it was in working order after it was properly assembled, since Inv. Stone test-fired it. T.298-304; Resp't Ex. T at 185. The proof at trial was that, during the incident, the rifle was loaded and actually was fired; it was only after the incident, while attempting to unload the rifle, that Dep. Duyssen accidently jammed it. *See* T.295-96, 304-05, 353-60, 411-12, 419-20. It therefore was entirely proper for the trial court to have admitted into evidence the rifle, proven at trial be operable, along with the shotgun, shell casings, the silhouette target with two holes in it, and the lab report. Mills has failed to demonstrate that there was an error of state evidentiary law, much less an error of federal constitutional magnitude. Accordingly, I recommend his evidentiary claim be dismissed.

### 5. Conspiracy

Mills contends that Judge Noonan, the Genesee County District Attorney, his trial attorneys, Deputies Weis and Duyssen, Inv. Stone, and various other Genesee County officials were engaged in a conspiracy to cover-up the allegedly illegal search and seizure and Mills'

mental health issues, in violation 18 U.S.C. §§ 1503, 1505, 241 & 242. *See* Pet. at 22-23 (Dkt. #1); Resp't Exs. V at 19-20 & JJ at 10-11. These statutes have no applicability to Mills' habeas challenge to the constitutionality of his state court conviction. Sections 1503 and 1505 of Title 18 of the U.S.C. involve the obstruction of justice occurring in federal court or before federal departments, agencies, or committees. *See* 18 U.S.C. § 1503(a) ("Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty . . ."); *see also* 18 U.S.C. § 1505. Sections 241 and 242 of Title 18 of the U.S.C. deal with the federal prosecution of civil rights violations involving a conspiracy among two or more persons to deprive another person of the free exercise of any constitutional right, on account alienage, color, or race. *See*, *e.g.*, 18 U.S.C. § 242 ("Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens . . ."); *see also* 18 U.S.C. § 241. Thus, not only is Mills' claim of conspiracy legally baseless, it is factually baseless as well, premised only on speculation. I accordingly recommend that it be dismissed.

### 6. Excessive force

Mills contends that Inv. Stone used "excessive force" in arresting him. *See* Pet. at 31

(Dkt. #1); Resp't Ex. V at 39-40. As respondent argues, a claim of excessive force arises under 42 U.S.C. § 1983, which is based upon the Fourth Amendment. In *Graham v. Connor*, 490 U.S. 383 (1989), the Supreme Court held that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995) (quoting *Graham*, 490 U.S. at 395) (emphasis in original). Fourth Amendment claims are barred from review on federal habeas pursuant to the doctrine articulated by the Supreme Court in *Stone v. Powell*, 428 U.S. 465, 482 (1976) ("[W]here the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie) (emphasis suppolied). Moreover, an excessive force claim does not implicate the validity of the defendant's state court conviction. *See Jackson v. Suffolk County Homicide Bureau*, 135 F.3d 254, 257 (2d Cir. 1998) (noting that "a claim for use of excessive force lacks the requisite relationship to the conviction") (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)); 28 U.S.C. § 2254(a). Accordingly, I recommend that Mills' excessive force claim be dismissed as not cognizable on federal habeas review.

### 7.    Fourth Amendment violations

Mills contends that his Fourth Amendment rights were violated because: (1) he has tried for four years to suppress the marijuana taken from his house which he claims was illegally searched and seized as he did not give the deputies permission to enter his house; and (2) the trial court improperly denied his motion to suppress the evidence taken from his father's house, "due to excessive force and no authorization to enter the house," and the court improperly ruled that he had no standing to challenge evidence taken from his father's house. *See* Pet. at 23-24, 31-32

(Dkt. #1); Resp't Ex. V at 20-21, 39-41. Mills, however, cannot dispute that he took advantage of the opportunity to litigate these claims in state court. The law is well-settled that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a contention that evidence recovered through an illegal search or seizure was introduced at trial. *Stone v. Powell*, 428 U.S. at 482; *accord Graham v. Costello*, 299 F.3d 129, 133-34 (2d Cir. 2002) (citing *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992)).

The Second Circuit has made it clear that all *Stone v. Powell* requires is that the state provide the petitioner the *opportunity* to litigate a Fourth Amendment claim; it matters not whether the petitioner actually availed himself of that opportunity. *See McPhail v. Warden, Attica Corr. Facility*, 707 F.2d 67, 69-70 (2d Cir. 1983); *Gates v. Henderson*, 568 F.2d 830 (2d Cir. 1977) (*en banc*), *cert. denied*, 434 U.S. 1038 (1978). Thus, in order to receive habeas review of a Fourth Amendment claim, a petitioner must demonstrate either (1) that the State failed to provide any "corrective procedures" by which Fourth Amendment claims could be litigated; or (2) that the State had such procedures in place, but that the petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70.

In this case, Mills cannot and does not contend that New York failed to provide appropriate corrective procedures to address his Fourth Amendment claims. "[T]he federal courts have approved New York's procedure for litigating Fourth Amendment claims," embodied in C.P.L. §§ 710.20 to 710.70. *Capellan*, 975 F.2d at 70 n.1 (internal quotation and citations omitted); *see also Gates*, 568 F.2d at 837 & n.4.

As for the second exception to the *Stone v. Powell* bar, Mills likewise has not

demonstrated that there was an "unconscionable breakdown" in the process, or that the state courts "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (internal quotations and citation omitted); *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987). Mills believes that there was an "unconscionable breakdown", essentially because the state courts reached, in his opinion, an incorrect conclusion. However, a "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process" *Capellan v. Riley*, 975 F.2d at 72.

It is undisputed that Mills took full advantage of New York's corrective procedures by moving to suppress, through attorney Lapine's omnibus motion, all property and statements taken from petitioner. *See* Resp't Ex. T at 10, 18-19. The trial court granted a hearing on the omnibus motion, where defense counsel argued, albeit unsuccessfully, that petitioner had a privacy interest in his father's house sufficient to give him standing to challenge the guns seized. *See* 3/19/04 Tr, at 3-5; Resp't Ex. T at 102. On September 20, 2004, petitioner, through new counsel, attorney Morabito, also sought suppression of all statements and evidence illegally seized from him, including the marijuana. *See* Resp't Ex. T at 73-74, 86-88. Mills was granted a hearing on his supplemental omnibus motion, and attorney Morabito noted that the court had granted him leave to address the suppression of the marijuana evidence, though the court ultimately denied the suppression motion as untimely. 9/30/04 Tr. at 3-4; Resp't Ex. T at 114-15. Moreover, petitioner not only litigated these suppression issues before the trial court, but relitigated them on direct appeal. *See* Resp't Ex. V at 20-21, 24-26. Therefore, petitioner clearly received a full and fair opportunity to litigate his Fourth Amendment claims in the state courts. He should now be barred from further review of these claims in this habeas proceeding.

*See, e.g.*, *Plunkett v. Johnson*, 828 F.2d 954, 956 (2d Cir. 1987) (holding that petitioner, convicted of grand larceny under state law, was not entitled to habeas corpus relief on ground that evidence obtained in unconstitutional search or seizure was introduced at his trial, where issue was fully litigated in suppression hearing, and was subject to state appellate review). Accordingly, I recommend that Mills' Fourth Amendment claims be dismissed.

**C.     Petitioner's cognizable claims regarding the denial of recusal, the denial of the right to a speedy trial, the ineffectiveness of trial counsel, and the ineffectiveness of appellate counsel should be dismissed as without merit.**

### 1.     Denial of recusal

Mills contends that Judge Noonan was disqualified and should have recused himself, under state law and the Fourteenth Amendment, due to his business relationship to the District Attorney and familial relationship to assistant district attorneys Robert and William Zickl. *See* Pet. at 12-13 & Resp't Ex. V at 6-8. This claim should be denied, however, because the rejection of Mills' argument by both the first C.P.L. § 440 court and the Appellate Division was neither contrary to, nor based on an unreasonable application of, Supreme Court law.

Recusal motions are committed to the sound discretion of the district court. *E.g.*, *LoCascio v. United States*, 473 F.3d 493, 495 (2d Cir. 2007). The Supreme Court has explained that adverse judicial rulings, standing alone, are not probative of judicial bias. *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Henriquez v. McGinnis*, 2007 U.S. Dist. LEXIS 2121, at *29 (S.D.N.Y. Jan. 10, 2007). "[J]udicial rulings and judicial remarks during the course of a trial that are disapproving of, or even hostile to, counsel, the parties, or their cases do not support a claim of bias or partiality unless they reveal 'such a high degree of favoritism or antagonism as to make fair judgment impossible.'" *Francolino v. Kuhlman*, 365 F.3d 137, 143 (2d Cir. 2004)

(quoting *Liteky*, 510 U.S. at 555).

In order to prevail on a claim of judicial bias, the petitioner must show that he was denied a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing." *Ungar v. Sarafite*, 376 U.S. 575, 584 (1964). A state court judge is only required to recuse himself if he has demonstrated "deep seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555; *McMahon v. Hodges*, 382 F.3d 284, 290 (2d Cir. 2004) (holding that judge's statement that defendant would likely be convicted given evidence at co-defendant's trial did not require recusal); *see also LoCascio*, 473 F.3d at 496-97 (recusal properly denied where rulings did not evidence deep-seated antagonism).

Here, none of the conduct about which petitioner complains involving Judge Noonan's business or familial relationships comes even close to approaching these standards. Judge Noonan rejected this claim on the merits when raised in the support of Mills' first C.P.L. § 440.10 motion, stating that his business relationship with the District Attorney had been long severed before he became a judge. *See* Resp't Ex. D at 2. Also, although Judge Noonan noted that he is first cousins with the Zickl brothers, their relationship did not legally preclude him from presiding over this case. *Id.* at 2-3. In fact, the New York state judicial disqualification rule apparently was not even applicable here because the District Attorney himself (and not the Zickl brothers, who were assistant district attorneys), tried the case. *See* T.1. Thus, Judge Noonan was not required to recuse himself under the due process clause merely for an appearance of impropriety based on relationships that did not even qualify for recusal under state law. *See Hardy*, 878 F.2d at 97. Additionally, petitioner did not proffer any evidence that, due to these relationships, Judge Noonan exhibited "deep seated favoritism or antagonism that would make

fair judgment impossible." *Liteky,* 510 U.S. at 555. Finally, petitioner's allegations that Judge

Noonan, among other things, "altered" pretrial and "discovery motions" because of his familial

relationships is based on nothing more than petitioner's own speculative and unsupported

assertions. *See* Pet. at 12-13 (Dkt. #1).

The familial relationship between the judge and members of the district attorney's office

about which Mills complains are clearly too far removed to be of constitutional significance. The

relationship would not support recusal under either state or federal law, as under New York law,

a fifth-degree relation to a party is necessary for recusal, while under 28 U.S.C. § 455(b)(5)(i),

applicable to federal district judges, a third-degree relation to a party is required for recusal. The

distant relationship raise no question concerning Judge Noonan's impartiality, and does not

support any claim that there was an appearance of impropriety, much less one that rises to the

level of a fundamental constitutional defect resulting in the denial of Mills' right to a fair trial.

Nor does the fact that long before he even became a judge, Judge Noonan practiced law with, and

had business dealings with, employees of the district attorney's office, give rise to a basis for

recusal. *United States v. Lovaglia*, 954 F.2d 811, 817 (2d Cir.1992) (finding that recusal was not

required where presiding judge had social and business dealings with a family whose business

entities were the victims of the defendants' racketeering activity, where the judge's relationship

with the family "ended seven or eight years prior to sentencing"); *United States v. Thompson*, 76

F.3d 442, 451 (2d Cir.1996) (finding no error where judge declined to recuse himself on the basis

of judge's prior employment as a federal prosecutor, where plaintiff had no knowledge of the

investigation related to the instant case); *United States v. Martin-Trigona*, 759 F.2d 1017, 1021

(2d Cir. 1985) (finding that judge properly denied recusal motion where plaintiff had sued judge

and judge's wife).

To the extent that Mills is claiming that the trial judge was biased as evidenced by his judicial rulings contrary to the defense, he has failed to set forth a violation of the due process clause. *See Liteky*, 510 U.S. at 556 ("All of these grounds are inadequate under the principles we have described above: They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."). Accordingly, I recommend that Mills' claim that the trial judge erroneously failed to recuse himself be dismissed.

### 2. Denial of right to a speedy trial

Mills contends that his constitutional right to a speedy trial was violated because the incident occurred on December 20, 2001, and his trial did not commence until November 17, 2004. *See* Pet. at 30-31 (Dkt. #1); Resp't Ex. V at 30-39. However, Mills neglects to mention that his first conviction on the charges stemming from the December 20, 2001 incident was vacated on October 7, 2003, after his successful C.P.L. § 440.10 motion arguing that the trial court improperly allowed Mills to waive indictment on class A felony charges. After that, the matter was returned to a pre-waiver of indictment status on October 15, 2003. Judge Noonan found that the vacatur of the superior court information following his grant of petitioner's C.P.L. § 440.10 motion "was tantamount to a withdrawal of his guilty plea" such that any delay before October

15, 2003, "should not be included in the statutory ready-for-trial[13] computation." Resp't Ex. T at 120-21 (citations omitted). Judge Noonan further found that the time between Mills' request for a mental health evaluation as ordered on January 7, 2002, through the October 15, 2003 order vacating the waiver and dismissing the superior court information was properly excluded because it was occasioned by the defense. In any event, the new indictment was handed down on October 23, 2003. The trial court ordered an adjournment of the proceedings until December 17, 2003, because Mills had decided to discharge his attorney. When the parties appeared in court on December 17, 2003, for Mills' arraignment, the prosecution announced its readiness for trial. *See* Resp't Ex. T at 120-21.

Mills' trial did not commence until November 15, 2004, which was 334 days (or 10 months and 29 days) after his arraignment on the second indictment. Contrary to his contention, I cannot find that this delay of 334 days violated his right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments to the Constitution. Even if I were to accept Mills' argument that the relevant period for calculating the delay is the interval between his arrest on December 20, 2001, and the commencement of trial on November 15, 2004 (2 years, 10 months, and 26 days, or 1061 days), I still do not recommend finding that the delay was extraordinary or presumptively prejudicial. *See Barker v. Wingo*, 407 U.S. 514, 515 (1972)).

In *Barker*, the Supreme Court adopted a "balancing test," and identified the following four factors to be used in determining whether a defendant has been denied his Sixth Amendment right to a speedy trial: (1) the length of delay; (2) the reason for the delay; (3) the defendant's

---

[13]     As a matter of New York State statutory law the prosecution generally must announce readiness for trial within six calendar months of arraignment. *See* N.Y. CRIM. PROC. LAW § 30.30.

assertion of his right; and (4) the existence prejudice to the defendant. *Barker*, 407 U.S. at 529-33; *accord*, *e.g.*, *United States v. Jones*, 129 F.3d 718, 724 (2d Cir.1997), *cert. denied*, 524 U.S. 911 (1998). As the Supreme Court explained in *Barker*, unless there is some delay that is "presumptively prejudicial," there is no need for inquiry into the other factors. *Id.* at 530; *accord*, *e.g.*, *Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988).

The Supreme Court and the Second Circuit have found that no constitutional speedy trial violation existed in cases in which the period between arrest and trial was even longer than that present in Mills' case. *See*, *e.g.*, *Barker v. Wingo*, 407 U.S. at 533-34 (noting that it was "clear that the length of delay between arrest and trial–well over five years–was extraordinary"; however, the fact that the delay caused "minimal" prejudice and the record showed no action "that could be construed as the assertion of the [defendant's] speedy trial right" "outweigh[ed] th[o]se deficiencies"); *United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir.1990) ("The length of the delay here [26 months] was less extensive than that tolerated in other cases."); *Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir.1988) (period of over seven years elapsed between the date that an arrest warrant was issued for appellant and the date on which petitioner was ultimately convicted on the New York murder charge); *United States v. McGrath*, 622 F.2d 36, 41 (2d Cir.1980) (24 months); *United States v. Lane*, 561 F.2d 1075, 1078 (2d Cir.1977) ("The delay here was quite lengthy[–]approximately 58 months or just under five years[–]but nevertheless was shorter than that in other cases in which no Sixth Amendment violation has been found."); *United States v. Infanti*, 474 F.2d 522, 527 (2d Cir. 1973) ("The length of time from arrest to indictment was 21 months and from arrest to trial 28 months, neither extraordinary."); *United States v. Teyibo*, 877 F. Supp. at 858-59 ("[A]n eighteen-month delay is considerably shorter than

the delays in other cases in which courts have found no Sixth Amendment violation."); *Holmes v. Bartlett*, 810 F. Supp. 550, 562 (S.D.N.Y.1993) ("In this case, the length of delay, eighteen months, was considerably shorter than the delays in other cases where courts found no Sixth Amendment violation.").

Even if I were to agree that the delay from his initial arrest on and the start of trial was "presumptively prejudicial," which I explicitly do not find to be the case, the other three *Barker* factors weigh against a finding of a speedy trial violation. The first *Barker* consideration, the reason for the delay, weighs heavily against petitioner. Nearly two years (specifically, 1 year, 11 months, and 27 days, or from December 20, 2001, until December 17, 2003), was taken up with the criminal proceedings on the first indictment, Mills' successful motion for vacatur of his conviction by guilty plea with regard to that indictment, the necessity of re-indicting and re-arraigning him, and his dismissal of his trial counsel. With regard to the delays that occurred before Mills went to trial on the second indictment, those were caused for the most part by his numerous *pro se* motions, such as his requests for a competency examination, that postponed the trial proceedings from May 25, 2004, until August 25, 2004. In addition, the court was kept busy with Mills' frequent firings of his attorneys. Thus, Mills was the reason for most, if not all, of the delays, making the "reasons for the delay" *Barker* factor weigh against him. There simply is no evidence of bad faith or deliberate delays occasioned by the prosecution here; nothing in the record indicates a deliberate attempt by the prosecution to delay the trial in order to hamper Mills' defense. *See Amable v. Scully*, 91 Civ. 4694 (MGC), 1993 WL 300036 at *3 (S.D.N.Y. Aug. 4, 1993) (stating that petitioner's "conclusory allegation" that "delay was due to the State's attempt to secure an 'unfair advantage' . . . is not supported by any evidence of bad faith on the

part of the State"); *United States v. Lane*, 561 F.2d at 1079 (finding no speedy trial violation

because, *inter alia*, "[w]hile the record here contain[ed] some rather long unexplained delays,

there [wa]s no indication that these [we]re attributable either to deliberate procrastination or even

negligent inaction on the part of the Government").

By the same token, there was no apparent prejudice to Mills given that the delays were to

allow resolution of his requests for relief and for substitutions of counsel. *See United States v.*

*McGrath*, 622 F.2d 36, 41 (2d Cir. 1980) ("Finally, appellants can point to no specific and

substantiated prejudice arising from the delay. The professions of anxiety and concern, and of

loss of witnesses' memory, are ephemeral. Absent specific assertions of such prejudice, it cannot

tip the balance here."). The Second Circuit has explained that "[a]lthough 'a showing of

prejudice is not a prerequisite to finding a sixth amendment violation, courts generally have been

reluctant to find a [constitutional] speedy trial violation in the absence of genuine prejudice.'"

*United States v. Jones*, 129 F.3d 718, 724 (2d Cir. 1997) (quoting *Rayborn v. Scully*, 858 F.2d at

94).

Finally, the *Barker* factor that looks at the timeliness of defendant's assertion of his

speedy trial right does not weigh in Mills' favor. Mills did not raise this issue until May 26,

2004,[14] in a motion to dismiss the indictment–2 years, 5 months, and 6 days after the date of his

---

[14]     The motion was made pursuant to C.P.L. § 210.20(1)(g), based on a violation of his statutory
speedy trial right under C.P.L. § 30.30. *See* Resp't Ex. T at 63-68. After trial, on December 13, 2004, the trial court
issued a decision denying the motion, noting that it had declined to entertain the *pro se* motion without the
participation of petitioner's then-retained attorney, and also wanted to await the results of petitioner's competency
determination where he was "subsequently determined fit to proceed." *See* Resp't Ex. T at 118-19; 8/25/04 Tr. at 3.
Petitioner's substitute counsel adopted petitioner's *pro se* motion on the eve of trial, and the trial court reserved
decision until the prosecutor responded on November 24, 2004. *See* Resp't Ex. T at 119. The trial court noted that
the vacatur and dismissal of the information upon petitioner's second C.P.L. § 440 motion "was tantamount to a
withdrawal of his guilty plea" such that any delay before October 15, 2003, "should not be included in the statutory
ready-for-trial computation." *Id.* at 120-21 (citations omitted). After Mills was indicted on October 23, 2003, there
were adjournments for petitioner to discharge several attorneys; he was finally arraigned on December 17, 2003. The

arrest. Moreover, even though Mills claimed a violation of his right to a speedy trial, he only

cited C.P.L. § 30.30, which is the state's trial-readiness statute. He did not cite C.P.L. § 30.20,

the section of the statute that embodies the Sixth Amendment's constitutional guarantee to a

speedy trial. *See* Resp't Ex. T at 63-68. Thus, Mills did not properly assert his constitutional right

to a speedy trial at that point. Notably, he did not raise it, under C.P.L. § 30.20 and in Sixth

Amendment terms, until *after* trial in his first C.P.L. § 440.10 motion, and again in his *pro se*

supplemental appellate brief. *See* Resp't Exs. A at 14-15 & V at 30. The belated assertion of his

rights under the state trial-readiness statute and the even longer delay in asserting a constitutional

speedy trial violation weigh heavily against a finding that petitioner's right to a speedy trial was

violated. *See*, *e.g.*, *United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir. 1990) (finding that the

third *Barker* factor "weigh[ed] heavily" against petitioners where they "waited roughly 22

months before advancing their speedy trial claim," which "hardly render[ed] plausible their

contention that an expeditious resolution of their cases was a matter of pressing constitutional

importance for them"); *United States v. McGrath*, 622 F.2d 36, 41 (2d Cir.1980) (finding that

"third [*Barker*] factor weigh[ed] against [petitioners who] waited until immediately before trial to

file their motion to dismiss on speedy trial grounds"); *United States v. Lane*, 561 F.2d 1075 (2d

Cir.1977) (finding that petitioner's "eve of trial" speedy trial motion was "indicative of an

interest in having the indictment dismissed, rather than of an interest in expediting the

proceedings"); *Burress v. Henderson*, 814 F. Supp. 313, 322 (W.D.N.Y.1993) (Curtin, D.J.)

(adopting report and recommendation and holding that petitioner's delay in assertion of right

---

prosecution also announced their readiness for trial that day. *Id.* at 120. Calculating the balance of the time periods, the trial court found that a total of thirty-nine (39) days was chargeable to the prosecution and, thus, it denied the statutory "speedy trial" motion as without merit. *Id.* at 122.

until commencement of trial was not "the type of 'aggressive' assertion of speedy trial rights necessary to warrant the relief sought"). Accordingly, I recommend that Mills' claim alleging a violation of his Sixth Amendment right to a speedy trial be dismissed.

### 3. Ineffective assistance of trial counsel

Mills re-asserts his claims, made on direct appeal, that he was denied the effective assistance of trial counsel. *See* Pet. at 17-21, 33-36 (Dkt. #1); Resp't Ex. V at 13-18, 41-42, 44-45. The Appellate Division, however, summarily rejected these claims, *Mills*, 28 A.D.3d at 1157, in a ruling which constituted an adjudication on the merits for purposes of AEDPA. *See Sellan v. Kuhlman*, 261 F.3d 303, 311-13 (2d Cir. 2001). Whether evaluated under pre-AEDPA or AEDPA standards, Mills has not come close to fulfilling the heavy burden imposed by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).

In *Strickland*, the Supreme Court held that, to establish ineffective assistance of counsel, a petitioner must satisfy a two-pronged test by showing that (1) his counsel supplied deficient representation that "fell below an objective standard of reasonableness . . . under prevailing professional norms"; and (2) he suffered prejudice as a result. 466 U.S. at 687-88; *accord, e.g.*, *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (stating that, in assessing the first prong, federal courts "must apply a 'heavy measure of deference to counsel's judgments" and "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside") (internal quotations and citations omitted). As for the prejudice prong, petitioner must show there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *accord Greiner*, 417 F.3d at 319. Where the court can "dispose of an ineffectiveness

claim on the ground of lack of sufficient prejudice," it need not address the performance prong of *Strickland*. *See* 466 U.S. at 697.

Mills complains about the performance of his pre-trial counsel, attorney Lapine, and his trial counsel, attorney Morabito, who also represented him during some pre-trial proceedings. Mills faults attorney Lapine for (a) getting sick and making failed attempts to file a notice of intent to offer psychiatric evidence; (b) failing to move to suppress the marijuana evidence; and (c) failing to challenge the improper joinder of count nine under C.P.L. § 200.20. After petitioner discharged attorney Lapine on August 25, 2004, his was assigned new counsel, attorney Morabito. Mills faults attorney Morabito for (a) failing to call a medical expert to present his intoxication and mental health defense; (b) failing to object to the admission of his statements to police at trial; (c) failing to object to the People's use of Inv. Stone as a "ballistics expert" or the Monroe County Public Safety Laboratory Report; (d) failing to cross-examine Inv. Stone as to the operability of the weapons, and the other officers as to the chain of custody; (e) failing to call his father, Elmer Mills, as a witness, or question the neighbor, Robert Chapman, as to the inoperability of the rifle; (f) conspiring with the judge and the District Attorney to conceal witnesses relating to petitioner's mental condition during the first few days he was incarcerated, weapon expert testimony, and evidence of his intoxication and mental health problems; (g) attempting to coerce petitioner into pleading guilty; and (h) failing to request a missing witness charge for the weapons expert, the medical examiner, and Mills' father. *See* Pet. at 17-21, 33-34, 35-36 (Dkt. #1); Resp't Ex. V at 13-18, 41-42, 44-45.

### a.      Pre-trial instances of counsels' ineffectiveness

The claims alleged against attorneys Lapine and Morabito are either factually baseless or

without merit. First, it was through no fault of his own that attorney Lapine suffered a heart-attack on January 2, 2004. As a result, he was forced to file a late notice of intent to offer psychiatric evidence. When he did so on April 24, 2004, and the trial court reserved decision on the motion until after the completion of the competency examinations. *See* Resp't Ex. T at 51, 61-62; 5/18/04 Tr. at 3-5, 16-17. Thus, Mills has not demonstrated how he was prejudiced as a result in the fact that attorney Lapine filed a late notice of intent to offer psychiatric evidence. Second, attorney Lapine *did* file a pre-trial omnibus motion requesting suppression of all property seized at Mills' father's house and the statements made by Mills to the police. *See* Resp't Ex. T at 10-29. This was denied by the trial court without prejudice with leave to refile. Shortly after being assigned, attorney Morabito filed a supplemental omnibus motion on September 20, 2004, requesting, *inter alia*, suppression of all statements by petitioner and all evidence illegally seized, including the marijuana, a late notice of intent to offer psychiatric evidence, and severance of count nine involving the marijuana possession. *See* 8/25/04 Tr. at 6-10; Resp't Ex. T at 71-74. After a hearing, the trial court granted Mills leave to file a late notice of intent to offer psychiatric evidence, provided that he  first be examined by a psychiatrist designated by the prosecutor. The trial court summarily denied the remainder of the supplemental omnibus motion. *See* Resp't Ex. T at 114-15. Thus, with respect to his pre-trial attorneys, petitioner's claims should be denied as baseless because they undertook all three of the actions that he claims they failed to perform.

> **b.** **Failure to call expert witnesses and other witnesses and failure to request a missing witness charge**

I turn next to petitioner's claim that attorney Morabito should have called a medical

expert to present his intoxication and mental health defense. The Second Circuit has noted that "there is no *per se* rule that requires trial attorneys to seek out an expert." *Gersten v. Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005). In general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review. *See United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to 'whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation'") (citations omitted), *cert. denied*, 532 U.S. 1007 (2001); *see generally Strickland*, 466 U.S. at 689 (actions or omissions by counsel that "might be considered sound trial strategy" do not constitute ineffective assistance) (citations omitted); but *see Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) (finding that trial counsel's failure to call medical expert in sexual abuse case involving a child victim where medical evidence was crucial, considered cumulatively with other errors, constituted ineffective assistance). Mills' contention that the outcome would have been different had trial counsel only retained an expert witness is based on nothing more than Mills' own speculative assertions. Significantly, he has not come forward with affidavits or other admissible evidence showing that there was, indeed, an expert witness who would have testified as he hoped. In any event, trial counsel was able to put forward a defense based on his client's intoxication and history of mental illness through other proof. Mills admitted that he had bipolar disorder and had smoked marijuana on the day of the incident. *See* Resp't Ex. T at 169-70. Trial counsel cross-examined Inv. Stone and Deputies Duyssen and Weis about their having been summoned because there was a report of person with bipolar disorder who was threatening suicide. Trial counsel elicited from Dep. Duyssen that he had been told that petitioner had been drinking and smoking marijuana that day, and was taking

prescription drugs; when he arrived at the house, petitioner had a half-full whiskey bottle on the table in front of him. *See* T.307-13; 355-79, 416-19.

Next, Mills contends that attorney Morabito was ineffective for failing to call petitioner's father as a witness or to question Chapman, the neighbor, as to the inoperability of the rifle. "[D]efense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb." *Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003). With regard to the failure to call Mr. Mills, I note that the tape of his 911 call regarding his son was played for the jury and submitted into evidence. During the 911 call, Mills' father indicated that his son was threatening to commit suicide and was bipolar. T.271-77. These were the key facts which defense counsel would have elicited from the father at trial. Trial counsel did call petitioner's mother, who testified as to her son's mental health history, including his past attempted suicides, his recent threat of suicide, and the change in his medication shortly before the incident. T.497-500. In light of petitioner's mother's testimony and the admission of the 911 calls made by petitioner's father, any testimony by the father would have been cumulative. Thus, it was reasonable for trial counsel not to call him.

With regard to trial counsel's failure to question the neighbor about the alleged inoperability of the rifle, this contention is without a factual basis: there was no point in questioning that witness on the topic of the rifle's operability when parties had stipulated to admission into evidence of the lab report showing that the rifle was, in fact, operable. T.470, 504.

Finally, Mills assails trial counsel for failing to request a missing witness charge with regard to (1) a purported weapons expert, (2) the psychiatrist who examined Mills, and (3) Mills' father. Under New York state law, a "missing witness" instruction allows the jury "to draw an

-49-

unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events." *People v. Savinon*, 100 N.Y.2d 192, 196 (N.Y. 2003). Contrary to Mills' contention, a missing witness charge was inapplicable here; such a charge is only asserted against the party (i.e., the prosecution in this case) who has failed to call a witness who would normally have been expected to support the opposing party's version of events. *See*, *e.g.*, *Nieves v. Fischer*, No. 03 CIV. 9803 (DC), 2004 WL 2997860, at *9 (S.D.N.Y. Dec. 28, 2004) ("To warrant a missing witness charge under New York law, the party requesting the charge must show that (1) the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case, (2) the witness would naturally be expected to provide non-cumulative testimony favorable to the party who has not called him, and (3) the witness is available to such party.") (citing *People v. Gonzalez*, 68 N.Y.2d 424, 427 (N.Y. 1986)). Here, neither petitioner's psychiatrist nor his father could reasonably have been expected to be called by the district attorney, as they had no favorable testimony to offer to the prosecution. Moreover, neither a weapons expert nor petitioner's psychiatrist would have provided non-cumulative testimony in favor of petitioner's mental health defense, the evidence of which, as noted above, was already submitted through other witnesses. *See*, *e.g.*, *Lebron v. Girdich*, No. 03 Civ. 2765 (NRB), 2003 U.S. Dist. LEXIS 21956, at *13-16 (S.D.N.Y. Dec. 5, 2003) (rejecting a petitioner's claim that counsel was ineffective for failing to request a missing witness charge because "the jury was squarely presented with the inconsistency that petitioner [wa]s concerned about, and there was no basis for petitioner's attorney to seek, or the trial judge to give, a missing witness charge.").

c.      **Allegations of trial counsel's involvement in a conspiracy**

**against petitioner**

Mills contends that attorney Morabito (1) attempted coerce him into pleading guilty, in exchange for a monetary settlement on his civil suits;[15] and (2) conspired with the trial judge and the prosecutor to conceal jailhouse witnesses who would have testified that petitioner was in a state of psychosis during the first few days he was incarcerated, who would have presented weapons-related testimony, and who would have submitted evidence of Mills' intoxication and mental health problems. *See* Pet. at 33-36 (Dkt. #1). Mills' contentions of coercion and conspiracy on the part of trial counsel are made without a shred of credible evidence in support. Accordingly, they should be summarily dismissed. *See Carr v. O'Keefe*, No. 94-CV-444 (EJS)(DNH), 1996 WL 521405, at *2 (N.D.N.Y. Sept. 12, 1996) (rejecting petitioner's "conspiracy theory" claim because "[m]ere conclusory allegations are not sufficient to make out a constitutional claim") (citations omitted); *see also Vasquez v. United States*, No. 96 CIV. 2104 (PKL), 1996 WL 694439, at *7 (S.D.N.Y. Dec. 3, 1996) (dismissing ineffective assistance claim where petitioner's "allegations [we]re vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source"; finding that "[t]he vague and unsubstantiated nature of the claims do not permit the Court to conclude that the charged errors reflect performance falling below an objective standard of reasonableness or that but for the errors the result would have been different"). Moreover, any allegation that Mills was pressured into accepting a

---

[15]     Mills is apparently referring to at least two 42 U.S.C. § 1983 civil rights suits he has filed against various corrections officers. These actions are pending in the Western District of New York. *See* Resp't Ex. V at 14-17, 41; *see also Mills v. Genesee Sheriff Dep't et al.*, No. 03-CV-00196 (RJA) (HKS) (W.D.N.Y. 2003); *Mills v. Luplow, et al.*, No. 04-CV-00005 (RJA) (JJM) (W.D.N.Y. 2004). On March 7, 2006, the Court (Telesca, D.J.) dismissed another one of petitioner's § 1983 suits. This action was filed against his appellate counsel, along with twenty-two other defendants, and alleged many of the same causes as raised in his habeas petitions. *See Mills v. Appellate Div. Fourth Dep't, et al.*, No. 05-CV-0612 (RJA) (W.D.N.Y. 2006), *appeal dism'd*, No. 06-1541-pr (2d Cir. Sept. 20, 2006).

hypothetical guilty plea was mooted by the fact that Mills elected to go to trial and, thus, there is

no way he can claim prejudice. Similarly, Mills has not proffered any evidence of how the

"concealed" witnesses would have testified or in what manner their testimony would have been

relevant to petitioner's mental condition or intoxication during the incident. And, as noted above,

there was no need for weapons expert testimony. Trial counsel did call witnesses and was able to

elicit, through Inv. Stone, Deputies Duyssen and Weis, the neighbor, the 911 calls, and

petitioner's mother, evidence of petitioner's mental condition and intoxication during the

incident. Thus, petitioner's claims of coercion and conspiracy should be denied as conclusory.

### d.      Failure to object to evidence and witnesses

Next, Mills contends that trial counsel failed to object to the admission of his statements

at trial, to the prosecutor's use of Inv. Stone as a "ballistics expert", and to the admission of the

Monroe County Public Safety Laboratory Report regarding the operability of the rifle. Mills

cannot demonstrate that any of these objections would have been successful, and the "[f]ailure to

make a meritless argument does not amount to ineffective assistance." *United States v. Arena*,

180 F.3d 380, 396 (2d Cir. 1999). Nor is it ineffective for trial counsel to decline to register an

objection that "appears without merit." *United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir.

1986) (defendant complained that trial counsel should have objected to the admission of

photographs of a witness whom he assaulted, that he should have called witnesses, and that he

should have subpoenaed hospital records of that witness; "[h]owever, an objection to the

photographs appears without merit" and there was "no evidence . . . presented of exculpatory

witnesses who may have been called"); *see also Ennis v. Walker*, No. 00 Civ. 2875 (DAB)(AJP),

2001 U.S. Dist. LEXIS 4431, at *75 (S.D.N.Y. Apr. 6, 2001) ("Because there would have been

no merit to any of the objections [petitioner] contends defense counsel should have made, counsel's failure to object does not constitute ineffective assistance.") (citing, *inter alia*, *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir.) (stating that "the failure to make a meritless argument does not rise to the level of ineffective assistance"), *cert. denied*, 516 U.S. 927 (1995)).

As noted above, both attorney Lapine and attorney Morabito filed pre-trial omnibus motions requesting suppression of all of petitioner's statements; the trial court denied the first request to preclude statements that were not included in the prosecution's C.P.L. § 710.30 notice, with leave to renew at trial, and it denied the second motion as untimely. *See* Resp't Ex. T at 10-29, 71-74, 101-04, 114-15. At trial, the tapes of the phone conversations which petitioner had with the police dispatcher and Dep. Duyssen were received into evidence by stipulation. *See* T. 250-52, 271-77. Attorney Morabito was not ineffective for failing to make a pointless objection to the admission of petitioner's statements which had already been deemed admissible by the court and were admitted through stipulation. *See Duncan v. Griener*, No. 97 Civ. 8754 (JGK), 1999 U.S. Dist. LEXIS 348, at *30 (S.D.N.Y. Jan. 19, 1999) (where trial counsel's objection "would have been fruitless . . . the failure to so object is not evidence of ineffective assistance of counsel"). In light of the defense theory that petitioner lacked the necessary intent, admission of his statements made during the 911 calls with the police dispatcher and Dep. Duyssen arguably supported such a defense. Similarly, there is no merit to Mills' arguments that counsel should have objected to Inv. Stone being used as a "ballistics expert" or to admission of the lab report regarding the rifle. First, the prosecutor never sought to qualify Inv. Stone as a "ballistics expert." T. 278-307. Rather, Inv. Stone testified that he was also the firearms instructor for the sheriff's office, and had familiarity with guns from hunting, likely to show that, despite his experience, he

was unable to reassemble the rifle. He acknowledged that it was later made operable by the lab before he test-fired it. *See* T.278-79, 299-303. Second, the only prosecution witness who could have been, but was not, qualified as an expert was the chemist who tested the marijuana. T.440-47. Furthermore, trial counsel did object to the admission of the silhouette target because Inv. Stone, and not a expert, had test-fired the rifle, as well as to admission of the rifle itself, because it was only test-fired after it was reassembled. However, counsel had no colorable basis on which object to the lab report since it was being admitted into evidence by stipulation. *See* T.282, 290, 301-04, 306, 470, 504.

### e. Failure to adequately cross-examine witnesses

Finally, I turn to Mills' assertions lambasting counsel for failing to cross-examine Inv. Stone as to the operability of the weapons, and the other officers as to the chain of custody. These allegations, like the rest of Mills' complaints about his defense attorneys, do not demonstrate ineffectiveness. Decisions about "whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature," and generally will not support an ineffective assistance claim. *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (holding that trial counsel's decision not to use victim's prior statements to impeach her was a strategic one entitled to deference); *see also United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (finding that trial counsel was not ineffective despite petitioner's claim that counsel had failed to throughly impeach prosecution witnesses since decisions as to nature and extent of cross-examination are strategic).

As noted above, the lab report showing that the rifle was made operable after proper assembly was submitted into evidence by stipulation of the parties. *See* T.470, 504. Trial counsel

thus had no reason to cross-examine Inv. Stone as to the operability of the rifle because such cross-examination would have been pointless. *See, e.g., Arena*, 180 F.3d at 396. Additionally, there was no question about the rifle's chain of custody. After Dep. Duyssen accidentally jammed it, Dep. Weis testified that he then secured the rifle and handed it to Inv. Stone who, after failing to reassemble it, had it taken to the sheriff's office where either he or Dep. Weis transferred it to the lab, as demonstrated by the presence of their names on the report. *See* T.297, 300, 360-61, 412, 419-20. Trial counsel had no reason to cross-examine Inv. Stone about the operability of the rifle, and made a strategic decision not to cross-examine Dep. Weis or Inv. Stone about the chain of custody of the rifle as there were no questions raised at trial about it. The other officers (Deputies Daniel Yackeren, Kris Kautz, and Timothy Weis) only testified about the marijuana's chain of custody, and had no testimony to offer concerning the rifle's chain of custody. *See* T. 425-30, 435-37, 451-52; Resp't Ex. T at 185.

### f.     Cumulative assessment of the alleged errors

Mills clearly cannot establish the first *Strickland* prong that attorney Lapine, who represented him pre-trial, and attorney Morabito, who appeared at some pre-trial appearances and throughout trial, performed in an objectively unreasonable manner. Indeed, as respondent points out and as has been detailed above, both trial counsel took most of the actions that petitioner complains they failed to perform. The "errors" to which Mills points are not really errors at all and, with regard to counsel's omissions, there is absolutely no possibility that, had counsel taken the actions Mills urged by him, the outcome of his trial would have been different. Furthermore, Mills has come forward with nothing but conjecture and surmise regarding the existence of a conspiracy, let alone trial counsel's participation in such an alleged cabal. To the contrary, the

record reveals that Mills received competent and effective representation from his attorneys. Notably, attorney Morabito convinced the jury to acquit his client on two of the top counts of the indictment. Given the eyewitness testimony of Deputies Duyssen and Weis and Inv. Stone, along with the other compelling evidence submitted at trial, petitioner cannot show "a reasonable probability" that, but for his attorneys' alleged errors, the outcome of his trial would have been more favorable than what he received. Accordingly, I recommend that Mills' claims of ineffective assistance of trial counsel be dismissed as without merit.

### 3.    Ineffective assistance of appellate counsel

According to Mills, the Appellate Division deprived him of his constitutional right to an appeal when Randolph Zickl, the Genesee County Assigned Counsel Administrator (who also happened to be Judge Noonan's cousin and the brother of two assistant district attorneys) assigned Del Atwell, Esq., as his appellate counsel. *See* Pet. at 34 (Dkt. #1). Mills further claims that attorney Atwell was ineffective for failing to (1) correspond with petitioner; (2) file a timely appellate brief; (3) address constitutional issues in his brief; and (4) provide him with a copy of the appellate brief and the record on appeal until days before the *pro se* supplemental brief was due. In addition, Mills believes that attorney Atwell operated under a conflict of interest since petitioner had filed several grievance complaints against him. *See* Pet. at 34-35 (Dkt. #1).

A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993)).  A petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on

appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *Mayo,* 13 F.3d at 533-34; *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001). It is not enough for a petitioner to show that appellate counsel omitted a colorable argument, as counsel is not required to raise all nonfrivolous claims on appeal. *Aparicio,* 269 F.3d at 95; *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983). Petitioner instead must demonstrate that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo*, 13 F.3d at 533. To establish prejudice, petitioner must show that absent counsel's deficient performance, there was a reasonable probability that petitioner's appeal would have been successful before the state's highest court. *Id.* at 534.

Because appellate counsel's brief was accepted by the Appellate Division, petitioner's claim that attorney Atwell failed to file a timely appellate brief is factually baseless. Also, Mills' claim that attorney Atwell failed to provide him with a copy of the appellate brief and record on appeal until days before the *pro se* supplemental brief was due should be summarily denied because petitioner did file a voluminous supplemental brief and, thus, he cannot show that absent this delay, his appeal would have been successful. Similarly, Mills' claim that counsel failed to address constitutional issues in his brief is meritless. Mills' appellate counsel adequately argued three colorable issues on direct appeal–the lack of an on-the-record competency finding, legal insufficiency of the evidence, and excessiveness of the sentence. *See* Resp't Ex. S at 16-40. Attorney Atwell raised federal constitutional issues with respect to the legal insufficiency and excessive sentence claims by citing relevant United States Supreme Court cases. *See id.* at 29, 39. Moreover, although the Appellate Division addressed all three of counsel's claims raised in his

appellate brief, it tellingly did not address in detail any of petitioner's *pro se* claims. Appellate

counsel quite reasonably decided not to risk diluting the strength of his other arguments by

pursuing the meritless claims urged by Mills.  *See Sellan v. Kuhlman,* 261 F.3d at 317 ("This

process of 'winnowing out weaker arguments on appeal and focusing on' those  more likely to

prevail, far from being evidence of incompetence, is the hallmark of effective appellate

advocacy."); *Smith v. Robbins,* 528 U.S. at 288 (Appellate counsel "need not (and should not)

raise every nonfrivolous claim, but rather may select from among them in order to maximize the

likelihood of success on appeal.") (citing *Jones v. Barnes*, 463 U.S. at 750-54).

Additionally, although the Sixth Amendment right to the effective assistance of counsel

means representation by conflict-free counsel, *see Wood v. Georgia*, 450 U.S. 261, 271 (1981), it

does not, however, guarantee a "meaningful relationship" between the defendant and his counsel.

*United States v. Doe #1*, 272 F.3d 116, 122 (2d Cir. 2001) (citing *Morris v. Slappy*, 461 U.S. 1,

13-14 (1983)). The proffered bases of the alleged conflict of interest are that appellate counsel

purportedly failed to correspond with petitioner, prompting petitioner to file grievance

complaints against him. The Second Circuit squarely has held that a petitioner cannot

manufacture a conflict of interest "'merely by expressing dissatisfaction with [the] attorney's

performance.'" *Doe #1*, 272 F.3d at 126 (quoting *United States v. Moree*, 220 F.3d 65, 71 (2d

Cir. 2000) ("'[A]n actual conflict of interest' does not necessarily arise every time that an

attorney responds to allegations of incompetent representation or contradicts his client in open

court.") (quoting *United States v. White*, 174 F.3d 290, 296 (2d Cir. 1999) ("White maintains that

his requests for substitute counsel and for an adjournment, coupled with his criticism of [his

attorney's] performance, created a . . . conflict of interest during the sentencing proceedings

below. We disagree. . . . White has essentially characterized a routine disagreement with his appointed counsel over defense strategy as a conflict of interest. However artful, White's claim is ultimately unpersuasive."); *see also United States v. O'Neil*, 118 F.3d 65, 71-72 (2d Cir. 1997) (finding no conflict of interest arising from defendant's failure to pay fees, from attorney's motion to withdraw, or from attorney's civil suit against client for failure to pay fees). As the Second Circuit observed in *White*, "[i]t would be an understatement to observe that disputes like the one between [Mills] and [his appellate attorney] arise frequently, and such disagreements often culminate in a defendant's request for substitute counsel." 174 F.3d at 296.

Mills has not demonstrated a potential, an actual, or a *per se* conflict of interest on the part of appellate counsel. Furthermore, Mills has failed to show either that attorney Atwell's representation of him in connection with his direct appeal fell below an objective standard of reasonableness or that he suffered prejudice as a result. Contrary to Mills' contention, he received competent representation in connection with his direct appeal. Significantly, the issues that Mills contends attorney Atwell should have raised were in fact raised by Mills in his supplemental *pro se* brief. The Appellate Division considered all of Mills' *pro se* claims, and rejected them on the merits. Thus, Mills quite plainly cannot demonstrate that he was prejudiced by any omissions on the part of his assigned appellate counsel. Accordingly, I recommend dismissing Mills' claims that he suffered constitutional violations in connection with his direct appeal and that appellate counsel failed to provide effective representation.

## V.    Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by petitioner be **DENIED**. Furthermore, the Court finds that petitioner has

not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). Therefore, the Court recommends that no Certificate of Appealability should issue with respect to any of petitioner's claims.

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: May 14, 2008
      Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: May 14, 2008
        Buffalo, New York.

.